IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

THOMAS WEIR PAUKEN II,
a/k/a: "Tom McGregor"

Defendant.

Case No. 1:26-MJ-67



**UNITED STATES' MEMORANDUM IN AID OF ITS MOTION FOR DETENTION**

The defendant Thomas Weir Pauken II is accused of acting as an agent of the People's Republic of China without notifying the Attorney General in violation of 18 U.S.C. § 951(a).  For approximately the last seven years, Pauken worked for multiple individuals he knew to be associated with foreign intelligence agencies, such as China's Ministry of State Security ("MSS"). In his work for these intelligence services, Pauken identified and recruited potential sources within the United States who could pass information to Pauken's Chinese handlers.  The goal, Pauken admitted, was to recruit individuals who would pass classified information to China.

Detention is appropriate for several reasons.

First, Pauken poses a serious flight risk.  Pauken has lived in China for over fifteen years. His family is in China.  His bank accounts are in China.  And he splits his time working for China's state news agency and China's intelligence services.  Simply put, despite being a United States citizen, Pauken's entire life is in China.  Now that he's been charged with a felony carrying a ten-year maximum sentence, Pauken is incentivized to run back to China or escape to the diplomatic security of a Chinese embassy.   Indeed, as explained below, the sophistication of his clandestine

work for the Chinese intelligence services only serves to underscore that his coconspirators have the means of effectuating such an escape.

Second, Pauken poses a significant danger to the public. His goal was to recruit individuals willing to pass classified information to the Chinese intelligence services. And he passed information to his handlers and recruited individuals through a web of encrypted messaging applications and cryptocurrency transfers. Now that he is facing mounting legal costs, and an inability to return to his job in China, he is incentivized to continue his work, which poses a risk to the public.

Third, Pauken's conduct reveals that he is unlikely to follow any court-imposed conditions of release. He has a history of trying to delete evidence and obfuscate his true intent. The Court cannot trust that Pauken will follow the Court's conditions of release.

The Court should detain Pauken pending trial.

## Procedural Background

On February 27, 2026, the Honorable Lindsey R. Vaala issued a criminal complaint charging the defendant with one count of acting as an agent of a foreign government, in violation of 18 U.S.C. § 951(a). The FBI arrested the defendant that same day, and he was brought before the Honorable Ivan D. Davis for an initial appearance on March 2, 2026. His detention hearing and preliminary hearing are scheduled for March 5, 2026. The government understands that Pauken intends to waive his preliminary hearing.

## Factual Background

Pauken is a fifty-year-old United States citizen. But it has been over fifteen years since Pauken lived in the United States. Pauken moved to China in 2010. Aff. in Supp. of Crim. Compl.

2

("Aff.") ¶ 14. Since October 2010, based on his travel records, Pauken has only made the following trips to the United States:

- **April 2017**: Pauken traveled from China to Texas, staying in the United States for approximately sixteen days.

- **December 2019**: Pauken traveled from China to New York, staying in the United States for approximately seven days.

- **June 2023**: Pauken traveled from Brussels to New York, staying in the United States for approximately fifteen days.

- **November 2023**: Pauken traveled from China to New York, staying in the United States for approximately seven days.

- **August 2024:** Pauken traveled from China to San Francisco, staying in the United States for approximately sixteen days.

- **January 2025**: Pauken traveled from Japan to Dulles International Airport, staying in the United States for approximately four days.

- **February 2026**: Pauken traveled from China to San Francisco, before continuing to Dulles International Airport. He stayed in the Washington, D.C. area between February 21, 2026, and his arrest by Dulles International Airport on February 27, 2026 (approximately six days).

In the over fifteen years since Pauken moved to China, he has only been in the United States for approximately ten weeks total, with no single trip lasting more than sixteen days. And, as described below, the trips from approximately 2019 to present were part of Pauken's work with the MSS.

Since moving to China, he has worked for various Chinese news agencies, including, as of March 2024, as an editor for Xinhua News, which is China's state news agency. *Id.* Apart from his work with Chinese-state news, Pauken worked for a series of people whom he knew to be working for Chinese intelligence agencies. For example, Pauken met someone named "Cathy" in about 2019. *Id.* ¶ 46. While Cathy was first introduced to Pauken as a consultant at a university

3

think tank closely connected with the Chinese government, *id.* ¶ 15, nothing about Pauken's relationship reflected a typical academic consulting gig.

Pauken never met Cathy at a university. *Id.* Pauken primarily communicated with Cathy via encrypted messaging applications, such as WeChat, signal, and Telegram. *Id.* ¶ 16. Cathy told Pauken to delete some of their communications, which Pauken did. *Id.* ¶ 52. When Pauken met Cathy in person, Cathy always brought another person. Cathy specifically told Pauken that she cannot visit the United States and that Pauken cannot talk about Cathy while he is in the United States. *Id.* Cathy told Pauken explicitly early in their relationship that she wanted to obtain classified information from Pauken. *Id.* ¶ 17.

If there was any doubt left, in 2022 or 2023, Cathy gave Pauken a polygraph examination because, according to Cathy, Pauken's reports to Cathy were going to Xi Jinping. *Id.* ¶ 18. During the polygraph, Cathy asked Pauken whether he was spying against the PRC and if he worked for the Central Intelligence Agency. *Id.*

In a subsequent interview, Pauken admitted what was obvious: Cathy worked for the MSS. *Id.* ¶ 48.

Nevertheless, Pauken continued to work for Cathy. Cathy paid Pauken for information that Pauken was able to provide through probing interviews with various U.S.-based persons. *Id.* ¶ 22. For example, Person 1 explained that between the end of 2023 through January 2025, Person 1 provided Pauken with various reports on topics that Pauken proposed, and Person 1 also participated in recorded interviews between Pauken and Person 1, *id.* ¶ 31, all of which Pauken passed back to Cathy. While Pauken told Person 1 he sought open-source information, Pauken also told Person 1 that Cathy wanted secretive information from Person 1. *Id.* ¶ 33.

4

In January 2025, Cathy instructed Pauken to travel to the United States and give Person 1 a Samsung cellphone and password information to encrypted messaging applications like Signal and Telegram and a filesharing website. *Id.* ¶ 23. Cathy also told Pauken to purchase a computer in the United States for Person 1. *Id.*

On January 29, 2025, Pauken landed at Dulles International Airport with Cathy's taskings, a Samsung cellphone, a yellow piece of paper with passwords for the encrypted messaging applications, and $3,000 that he planned on using to purchase Person 1 a laptop. As he admitted to investigators, the purpose of his trip was to complete the taskings that Cathy had assigned him. *Id.* ¶ 21.

Pauken's January 2025 trip was not an outlier. He explained to investigators that Cathy paid him to make trips to the United States beginning in 2019. *Id.* ¶ 25. Over the last six years, as reflected in Pauken's travel records described above, Pauken traveled to the United States at Cathy's request on six occasions, including his most recent trip. *Id.*

In February 2026, Pauken returned to the United States. *Id.* ¶ 45. Pauken admitted that Cathy tasked him to provide a SIM card to Person 1, which Pauken did. *Id.* ¶ 47. Pauken even offered to give Person 1 a bonus of $10,000 for Person 1 to continuing working for Cathy. *Id.* ¶¶ 39, 42. Pauken said that he could pay Person 1 through an apparent dead drop in a P.O. box in another state or through a website "donation." *Id.*

Pauken's work for Cathy was also not an outlier. Pauken told investigators about "Richard" and "William," whom Pauken believed worked for the Chinese government. *Id.* ¶ 26. Like Cathy, Pauken wrote reports for Richard and William. *Id.* And, like Cathy, Richard and William wanted Pauken to take a polygraph examination. *Id.* But, unlike Cathy, Richard and

William asked Pauken to apply to the U.S. State Department and report on his progress, *id.*, which is classic espionage.

Pauken also discussed work for a group in Wuhan, China, who sought information on technology and the U.S. Department of Justice. *Id.* ¶ 27. The Wuhan clients wanted Pauken's help in finding an expert who could engage in cyber espionage. *Id.* Pauken admitted that he thought his point of contact for this group in Wuhan worked for MSS. *Id.*

Pauken told investigators that his ultimate goal was to facilitate the passing of classified information from U.S.-based persons to the Chinese intelligence officials. In January 2025, Pauken told the FBI that he was 80% sure that Person 1 would provide classified information to China if Person 1 was hired by the incoming administration. *Id.* ¶ 24. More recently, in February 2026, Pauken explained that—while he did not personally want to handle classified information— he was part of a conspiracy to recruit individuals to provide classified information to the MSS. *Id.* ¶ 50.

In all, Pauken received over $100,000 for his work with Cathy, along with expenses for his trips to the United States, and an all-expenses-paid trip to Shanghai for Pauken and his family. *Id.* ¶ 25. Cathy often wired the money to Pauken's wife's accounts in China. *Id.* Indeed, the government is not aware of any U.S.-based bank accounts in Pauken's name.

### The Bail Reform Act of 1984 – 18 U.S.C. § 3142

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, shall issue an order that, pending trial, the person be (1) released on personal recognizance; (2) released on a condition or a combination of conditions; or (3) detained under subsection (e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e). In turn, as relevant here, subsection (f)(2) authorizes detention

6

where there is: (1) "a serious risk that such person will flee;" or "a serious risk that such person will obstruct or attempt to obstruct justice."

If detention is authorized, pursuant to Section 3142(g), the Court must consider whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. "Subsection (g) sets out the factors that a judicial officer considers in its pretrial detention decision: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the [defendant],' (3) 'the history and characteristics of the [defendant],' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release.'" *United States v. Vane*, 117 F.4th 244, 250 (4th Cir. 2024) (quoting 18 U.S.C. § 3142(g)(1)–(4)).

Section 3142 "entitles the government to make evidentiary proffers during detention hearings." *Vane*, 117 F.4th at 252. Ultimately, the government's burden of persuasion is "to show by clear and convincing evidence that the defendant is dangerous or by a preponderance of the evidence that he's a flight risk." *Id.* at 251. "For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient; both are not required." *United States v. Stewart*, 19 F. App'x 46, 48–49 (4th Cir. 2001) (citing *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir.1992)).

## Argument

The defendant poses a significant flight risk, poses a danger to the community, and no condition or combination of conditions can ensure his presence at court proceedings or ensure the safety of the community.

## I.   Pauken Poses a Significant Flight Risk.

### A.  History and Characteristics of the Defendant.

The "history and characteristics" of the defendant weigh in favor of detention because Pauken's ties are to China, not the United States. *See* 18 U.S.C. § 3142(g)(3). Despite being born and raised in the United States, Pauken's home country is now China. Pauken's wife is Chinese. His son is now located in China with his wife. Pauken is employed by the Chinese government and gets paid on the side as an intermediary for Chinese intelligence services. The money Pauken makes goes into his wife's Chinese bank accounts.

Further, Pauken does not have any ties to the United States. The government is not aware of any bank accounts in Pauken's name in the United States. Based on interviews with the FBI, he does not speak to his siblings. And—apart from the occasional one- or two-week trip to the United States at the request of Cathy—Pauken has barely spent time in the United States over the last fifteen years.

At bottom, Pauken's home country is, for all intents and purposes, China. His ties to China are an incentive for him to flee the United States.

### B.  Weight of the Evidence.

The "weight of the evidence" militates in favor of detention. *See* 18 U.S.C. § 3142(g)(2). Pauken faces a current charge of acting as an agent of the Chinese government, which carries a ten-year maximum penalty. 18 U.S.C. § 951(a). Pauken confessed to the crime as charged, both in January 2025 and in a recorded interview in February 2026. Moreover, there is substantial corroborating evidence, including testimony from Person 1 and physical evidence, such as the Samsung device and yellow piece of paper that Pauken gave to Person 1. The FBI also continues to review dozens of communications between Pauken and Cathy, Pauken and Person 1, and Pauken

8

and others, which corroborates the *modus operandi* that Pauken told investigators. *See* Aff. ¶¶ 55-58. At bottom, the weight of the evidence is strong, and Pauken knows as much.

The investigation continues. Pauken admitted to being part of a conspiracy to obtain classified information for China—a charge that carries a significantly higher maximum penalty: life. *See* 18 U.S.C. § 794(a), (c) (providing penalties for conspiring to gather or deliver defense information to aid foreign government). While the government's investigation has not yet resulted in charges of § 794, Pauken's criminal exposure is not limited to § 951(a), which provides additional incentive for Pauken to flee.

Where, as here, the weight of the evidence against Pauken is strong, there is a significant risk that Pauken will flee. *See United States v. Riley*, 635 F. Supp. 3d 411, 417 (E.D. Va. 2022) (finding surveillance footage of defendant committing the crimes to be compelling); *United States v. Mallory*, 268 F. Supp. 3d 854, 863-64 (E.D. Va. 2017) (finding, in a case brought under 18 U.S.C. § 794(a), that "the weight of the evidence against defendant is significant and substantial, and thus increases the risk that the defendant will flee").

### C. Nature and Circumstances of the Offense.

The "nature and circumstances of the offense" likewise support the conclusion that Pauken is a flight risk. Pauken worked for Chinese intelligence agents. The MSS is akin to a combined FBI and CIA that is responsible for counterintelligence, foreign intelligence, and political security. Aff. ¶ 5. The goal of the MSS—and the Chinese intelligence services more generally—is to spy on the United States. As this case shows, MSS agents are willing to go through great lengths to protect their nefarious conduct. Here, Pauken admitted to the steps that Cathy took to protect her relationship with Pauken, including using encrypted platforms, coordinating in person meetings, having Pauken delete communication, and instructing Pauken not to discuss her when he is in the

9

United States. Pauken's recent conduct shows just how sophisticated the MSS's operation can be: Pauken offered Person 1 a $10,000 bonus that Person 1 could receive through a "dead drop" in a P.O. box in another state—all coordinated through Pauken. All that is to say, Pauken's employer are sophisticated intelligence agents. Pauken may seek their protection—either through flight from the U.S. or refuge in an embassy—in order to avoid this prosecution.

## II.    Pauken Poses a Danger to the Community.

Pauken admitted that the ultimate goal of his work with his MSS handlers was to get classified information from the United States to China. Danger to the community, under the Bail Reform Act, is not limited to physical violence and includes continued criminal activity that poses a danger to the public at large. *See* S. Rep. No. 98-225, 98th Cong., 1st Sess. 12 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("[T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."); *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence.").

The Supreme Court has unequivocally held that protecting the secrets that contribute to the U.S. national security is vital. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that *no governmental interest is more compelling* than the security of the Nation.") (emphasis added). More particularly, "'[t]he Government has a substantial interest in protecting sensitive sources and methods of gathering information,'" *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008) (quoting *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985)), and in "protecting both the secrecy of information to our national security and the appearance of

10

confidentiality so essential to the effective operation of our foreign intelligence service.'" *Abu Ali*, 528 F.3D at 247 (quoting *CIA v. Sims*, 471 U.S. 159, 175 (1985)). Any continuing criminal threat to national security interests logically must fall within the purview of the Bail Reform Act.

Here, Pauken knew that he was working for the MSS. He knew he was recruiting individuals who could provide the MSS with classified information. In fact, he said he was 80% sure that Person 1 would do just that. Nevertheless, he facilitated the MSS's end goal of obtaining classified information through covert means.

The fact that Pauken told investigators that *he* avoided handling classified information himself does not change the end result of Pauken's work with the MSS: he admitted he was a "middleman" who was connecting the MSS with people who could provide China with classified information.

If released pending trial, Pauken poses a continued danger to the community. His family and money are in China. He faces litigation costs in the United States. He is faced with dilemma of needing to continue passing information to the MSS—such as the identity and status of potential recruits—in order to ensure a supply of money and, perhaps, the safety of his family.

## III.    No Condition or Combination of Conditions Can Reasonably Mitigate These Risks.

Even the most stringent of pretrial conditions cannot mitigate the risk posed by Pauken. Prohibiting or severely restricting the defendant's use of or access to the internet is "notoriously difficult to enforce." *See United States v. Ojo*, 2020 WL 7707341, at *2 (D. Md. Dec. 29, 2020). This is particularly true in an age where most televisions are internet capable and where wireless access is often available from areas surrounding one's residence, even if a home's internet subscription is discontinued. *See United States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y. 2006) ("Even if the Court were to order electronic monitoring and home detention of the defendant

pending trial, that condition would not adequately address his ability to access phones or computers in his home which could be used for the types of illicit activities described above, even if steps were taken to try to prevent those items from being present or available in the house. In this day and age, with devices such as cellphones, Blackberries, and laptops, there are no conditions which can reasonably assure the safety of the community under the particular circumstances of this case if the defendant is released on bail.").

Further, based on his past conduct, the government does not believe Pauken will follow the Court's order regarding pretrial conditions of release. He has shown a desire to obfuscate the true nature of his conduct and intent. He admitted to deleting evidence in the form of his communications with Cathy. And, notably, after Pauken agreed not to tell anyone about his conversations with the FBI in January 2025, Pauken admitted that he told Cathy about meeting with federal agents. This shows that Pauken is willing to tell whomever he is talking to exactly what they want to hear, without care about prior promises he made, including promises to the government. Pauken cannot be trusted to abide by the Court's orders.

//

//

//

//

//

//

//

//

12

## Conclusion

For the foregoing reasons, the United States respectfully moves to detain the defendant pending trial.

Respectfully submitted,

Todd Blanche
Deputy Attorney General


_____/s/_____
Gavin R. Tisdale
Assistant United States Attorney
U.S. Attorney's Office, EDVA
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-2100
gavin.tisdale@usdoj.gov

Eli Ross
Trial Attorney
National Security Division, CES

13

## Certificate of Service

I hereby certify that the foregoing was transmitted to counsel of record and the Court via email and will be filed on the public docket when the case is unsealed.


March 4, 2026                                    /s/ Gavin R. Tisdale
                                                 Gavin R. Tisdale
                                                 Assistant United States Attorney

14